J. H. SHUTTLEFIELD, Appellee, v. W. J. NEIL, Appellant.

**Evidence:** PRIVILEGED COMMUNICATIONS: OBJECTIONS: BURDEN OF
1 PROOF. One objecting to evidence on the ground that it is a communication between attorney and client, and therefore privileged, has the burden of showing that it is privileged; and if the objection is overruled because of an insufficient showing in this respect, and subsequently the other party offers evidence tending to establish the relationship, the objecting party must move to strike such evidence in order to preserve the objection for review on appeal. In the instant case the evidence before the court at the time of the ruling was not such as to disqualify the witness.

**Instructions:** WHEN THE LAW OF THE CASE. Where no exception is
2 taken to instructions as given by the court they become the law of the case.

**Fraud in the sale of land:** REPRESENTATIONS AS TO CHARACTER AND
3 LOCATION: RELIANCE THEREON: EVIDENCE. An owner of real estate is presumed to know his property, and in the absence of knowledge to the contrary a purchaser may rely upon his representations as to its location. In this action for damages because of the alleged false representations of defendant as to the character and location of the land conveyed to plaintiff, the evidence is held to require submission of the questions whether the representations were fraudulently made and relied upon, and whether plaintiff was entitled to rely upon the same.

Same: MEASURE OF DAMAGES: INSTRUCTION. Where plaintiff alleged that defendant and his agent knew that the land shown him was not the land owned by defendant and which he expected to convey to plaintiff, and that his representations that the land he owned was largely smooth, valley land were false, and made for the purpose of deceiving plaintiff, that plaintiff relied thereon and was damaged to the extent of the difference between the value of the land as represented and its actual value, an instruction that plaintiff was entitled to the difference between the fair market value of defendant's land and the market value of the land pointed out to him, or what it would have been worth if as represented, was not erroneous because failing to limit his damages to the difference in value between that pointed out and that actually conveyed.

Same: FRAUD OF AGENT: LIABILITY OF PRINCIPAL. The owner of land is liable for the fraud of his agent in pointing out to a purchaser different land from that involved in the contract of sale or exchange.

Same: FRAUD: RIGHTS OF PURCHASER. Where there has been a mutual mistake in the sale or exchange of land the injured party may rescind; but if brought about by fraud he may either rescind or sue at law for damages.

Same: ELECTION OF REMEDIES: WHO MAY OBJECT. A party who has effected a sale or exchange of lands by fraud or deceit cannot complain that the injured party has elected to sue at law for damages, rather than bring an equitable action for rescission.

Same: INSTRUCTIONS: BURDEN OF PROOF. Where plaintiff alleged in his petition that he was defrauded in a large measure by the false representations of defendant's agent, an instruction that the burden was upon plaintiff to establish by a preponderance of the evidence that he was defrauded by defendant as alleged in the petition was sufficient, without specifically charging that the burden was upon plaintiff to establish the agency.

Same: EVIDENCE OF VALUE. Where the agent of defendant pointed out to plaintiff other land than that conveyed, evidence as to the value of the land pointed out was admissible in an action for fraud, although there were improvements on such land and plaintiff had been told that defendant's land was unimproved.

*Appeal from Wapello District Court.*—HON. FRANK W. EICHELBERGER, Judge.

WEDNESDAY, JANUARY 21, 1914.

ACTION to recover damages for alleged false representations in the sale of land. Jury trial, verdict and judgment for plaintiff. Defendant appeals.—*Affirmed.*

*McNett & McNett* and *Seneca Cornell,* for appellant.

*Jaques & Jaques,* for appellee.

PRESTON, J.—Prior to October 14, 1909, plaintiff was the owner of two hundred and eighty acres of land in Davis county, Iowa, and defendant owned two hundred and forty acres in Kearney county, Kan. September 23, 1909, plaintiff and his wife, and defendant, entered into the following contract in regard to their properties:

This contract entered into on this 23d day of Sept., 1909, by and between J. H. Shuttlefield and Augusta Shuttlefield, parties of the first part, and W. J. Neil, party of the second part, witnesseth: That parties of the first part hereby agree to sell to party of the second part their two hundred and eighty acre farm in Soap Creek township, Davis county, Iowa, at $40.00 per acre. Said farm being the farm on which said first parties are now living. Second party to turn in his two hundred and forty acre farm in Kearney county, Kansas, at $20.00 per acre, and any balance to be paid by second party in cash. It being understood that $500.00 of said balance shall be paid by second party to first parties when a written acceptance of said Kansas land at said price is made by first parties. It being understood that this contract shall be in full force and effect only in case said first parties are willing to accept said Kansas land at said price, after an inspection thereof. Said option to be exercised on or before Oct. 15, 1909. In case said option is exercised, both parties agree to furnish warranty deeds and abstracts of title to their re-

spective premises, showing good and sufficient title thereto. All papers to be exchanged and possession given on or before March 4, 1910.

J. H. Shuttlefield

Augusta Shuttlefield

Parties of the First Part.

W. J. Neil

Party of the Second Part.

Before October 14, 1909, plaintiff and one William K. Williamson went to Kearney county, Kan., to examine the land, and after their return the following acceptance was executed:

Whereas parties hereto on Sept. 23, 1909, entered into an option wherein first parties agree to sell their two hundred and eighty-acre farm in Soap Creek township, Davis county, Iowa, at $40.00 an acre and accept as part payment thereon, the two hundred and forty-acre farm of second party in Kearney Co. Kansas, at $20 an acre, and balance to be paid in cash, said deal to be closed providing the Kansas land was acceptable to first party, and whereas first party has examined the Kansas land and the same is acceptable to him at said price, said option is hereby exercised, and the parties hereto agree as follows: To at once make and deliver warranty deeds and abstracts to their respective premises. Second party to pay to first parties the balance due them, amounting to $11,200.00 minus the amount now due on the $4,500.00 mortgage to John Webber and the $500.00 mortgage due to Steckel & Sons, and the full amount of the judgment, and any other liens of any kind which may appear against said property of said parties.

It is further agreed that said parties shall pay the taxes on the Kearney county land and Neil shall pay the taxes of 1909 on the Davis county land.

Dated, Ottumwa, Iowa, October 14, 1909.

J. H. Shuttlefield

Augusta Shuttlefield

Parties of the First Part.

W. J. Neil

Party of the Second Part.

Deeds bearing date October 14, 1909, were exchanged. In the deed from defendant to plaintiff for the Kansas land the consideration is given as $4,800, and in plaintiff's deed to defendant for the Davis county land the consideration named is $11,200.

There is a dispute between the parties and a conflict in the evidence as to whether Williamson was the agent of defendant or plaintiff in the transaction. Plaintiff claims that defendant represented that his Kansas land consisted of two hundred acres of valley or bottom land and forty acres of hill land; that Williamson was defendant's agent, and that defendant and Williamson conspired to, and that Williamson did, fraudulently point out land which corresponded with that described and represented, but that the land so shown was not the land owned by defendant; that the land owned by defendant and conveyed to plaintiff was sand hills and of but little value. Defendant's land was in section 19. The undisputed evidence is that the land shown to plaintiff by Williamson was situated about five miles from defendant's land and was in section 11. The evidence for plaintiff tends to show that defendant agreed to send Williamson to Kansas with plaintiff to show him the land, and that in this, also, Williamson was acting as agent for defendant. It is conceded by appellant, in argument, that the jury must have found against the defendant as to the agency of Williamson, and that there was such a conflict in the evidence that they cannot ask this court to disturb that finding. We should assume then that Williamson was the agent of defendant.

I. W. H. McElroy, an attorney and abstracter, was called as a witness for plaintiff to testify in regard to statements by defendant in regard to the Kansas land. Defendant objected on the ground that such statements were privileged communications between attorney and client under section 4608 of the Code. Before the witness gave his testimony he was cross-examined by counsel for defendant as to the

1. EVIDENCE: privileged communications: objections: burden of proof.

nature of his relations with Neil. Witness testified that he was acting as attorney for plaintiff, and denied that he was acting as attorney for Neil or that he had been so employed; that he never gave defendant any advice; that defendant knew he was plaintiff's lawyer; that Seneca Cornell was defendant's attorney; that, after the first contract had been signed by plaintiff and wife, defendant asked witness to change the figures therein, $40 to $37.50, which witness refused to do; that he did have his stenographer run off another contract like it, except that the price of the Iowa land was fixed at $37.50 instead of $40 per acre, in order that defendant might try to get plaintiff to agree to a reduction; that he made no charge for rewriting this agreement; that the negotiations in regard to the deal, or many of them, took place in McElroy's office, and at one time when it appeared that the trade would be consummated, defendant told McElroy if it went through he would make McElroy a present of $25 because of the bother to him; that McElroy informed plaintiff of this. The $25 was paid when the matter was concluded. McElroy did draw the deed for the Kansas land from Neil to plaintiff. He says the only thing he did for defendant for which he could make a charge was the drawing of this deed. This was substantially the situation at the time the court overruled defendant's objection to this testimony. The court stated that from this evidence he did not think the relation of attorney and client existed at that time; that, if anything, it was scrivener work.

After the witness had given his testimony, defendant testified that he had employed McElroy as his attorney, and McElroy produced his books from which it appeared that an entry had been made in regard to the $25 item which defendant claims was a charge against defendant, but which the witness claimed was only a minute to show the amount of money taken in by him.

If this evidence had all been before the court when the ruling was made, it would have made a conflict in the evi-

dence for the determination of the court. Defendant was the objecting party and had the burden of showing that the witness was the attorney for defendant and the communications privileged. As stated, this evidence was not all before the court when the ruling was made. The ruling was correct when made. *O'Mara v. Jensma,* 143 Iowa, 297, 303. We do not find in the record that defendant moved to strike this evidence after the evidence on this point was all in. The situation is unlike that in *Hanson v. Kline,* 136 Iowa, 106. In that case the attorney testified that the relation of attorney and client did exist, and the objection was therefore properly sustained.

II. On the question as to whether plaintiff relied upon the alleged fraud and representation of defendant and his agent, or whether he should be heard to so say, the court instructed:

(5) To recover in this action the plaintiff must show by the greater weight or preponderance of the evidence that the representations were made as alleged; that they were false and untrue; that the defendant knew that they were false and untrue; that they were made for the purpose of inducing the plaintiff to make the trade; that the plaintiff relied on said representations and was thereby induced to make the trade, relying upon such representations as true, and that, in so relying on such representations, he exercised ordinary care and prudence.

(6) The allegations of fraud and misrepresentation charged in plaintiff's petition and for which he claims damages in this case are: First: That defendant represented to him that he owned two hundred acres of valley land and forty acres of hill land in Kearney county, Kan., worth $20 per acre, which land would be shown to plaintiff in case of a trade, and, if then satisfied, the trade would be made; second, that defendant afterwards sent one Williamson as his agent to show plaintiff the land, and that said Williamson showed him about two hundred acres of nice bottom land, irrigated or subject to be irrigated, and forty acres of hill land, as the Neil land, and afterwards made him a deed for a different and inferior piece of land; that the land shown

him was in section 11 and the land deeded was in section 19.

(7) If you find from the greater weight or preponderance of the evidence that prior to the trade the defendant told plaintiff that he owned two hundred acres of level or valley land and forty acres of hill land in Kansas, which he would put into trade at $20 per acre, and that plaintiff relied on this statement as to the quality of the land and was thereby induced to make the trade, and that the plaintiff in the exercise of ordinary care had the right to rely on such representation as true, and that defendant made the representation for the purpose of inducing the plaintiff to make the trade, and you further so find that such representation was not true and that the defendant knew that they were not true at the time, you should find for the plaintiff.

(9) Another element which is essential to plaintiff's recovery in this action is that the plaintiff relied on such representation and was thereby induced to make the trade, and that he, in the exercise of ordinary care had the right to rely on them. It is for you to say, from all the evidence in the case, and the circumstances proven thereby, whether the plaintiff had the right, in the exercise of ordinary care, to rely on them. You should consider for this purpose, among other circumstances, the fact that the plaintiff reserved the right in his option contract to see the land before completing the trade; that he did go out to see the land, and the situation and condition of the land shown to him when he went out to see the land; what buildings, structures and fences were on the land, so shown to him, and all the other facts and circumstances in evidence. If the plaintiff, in the exercise of ordinary care, did not rely on any representation made by defendant, if he did make any, the defendant would not be liable in this action for such representation.

(14) In determining whether plaintiff relied on Williamson's statement that the land in section 11 was Neil's land, and whether as an ordinarily prudent man he had the right to rely on such statement, if it was made by Williamson as defendant's agent, you should consider, compare, and weigh all the testimony and evidence in the case, and all the circumstances which such evidence tends to prove. You should take into consideration plaintiff's age, experience, and education, or lack of it; what objects were visible on the land pointed out in the way of houses, occupied and unoccupied;

fences and other structures; crops growing, if any; pumping stations, and electric wires and poles on and across the land; the character of the land thus shown, whether level or hilly, capable of irrigation, or not; whether or not there was any evidences that it had been irrigated and cultivated; the character of the day and opportunities for seeing the land; whether Williamson had an abstract with him giving the right numbers of the land, and if he did, whether he showed it to plaintiff or told him the right numbers of Neil's land in section 19, and if he did whether plaintiff understood him or could locate the right land therefrom; what, if any, inquiries he made from others living near the land, and if he made no such inquiries, the reason therefor; whether Williamson made a positive statement that it was Neil's land, or whether he said it didn't look exactly like it to him, and all the other facts and circumstances in evidence.

The only objection made by defendant to any of these is the clause, near the end of No. 14, which reads, "what, if any, inquiries he made from others living near the land." This will be referred to later. He makes no complaint as to the law as given by the court in regard to the care required of plaintiff in making the trade.

Plaintiff says that, under the facts of this case, the rule given by the court, and as contended for by defendant, does not apply; that under the later cases a purchaser of property is not required to investigate, but may rely on the representations of the seller, if the statement or representation is a positive affirmation of a fact. Plaintiff is not in a position to complain, and does not, but says the instructions given were more favorable to defendant than he was entitled.

Many authorities are cited by both parties. but there is really no serious difference between them as to the law. The fact question as to whether or not plaintiff was, or should have been, misled has been elaborately argued by both sides; defendant contending that the evidence is not sufficient to sustain the verdict, while plaintiff contends it was a question for the jury. This appears to be the point most strongly urged

by appellant for a reversal. We shall refer to some of the many cases cited. Defendant cites *Slaughter v. Gerson,* 13 Wall. 379 (20 L. Ed. 626, 627), from which we quote: "This misrepresentation, which will vitiate a contract of sale and prevent a court of equity from aiding its enforcement, must not only relate to a material matter constituting an inducement to the contract, but it must relate to a matter respecting which the complaining party did not possess at hand the means of knowledge; and it must be a misrepresentation upon which he relied, and by which he was actually misled to his injury. A court of equity will not undertake, any more than a court of law, to relieve a party from the consequences of his own inattention and carelessness. Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matter directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another." "*Volenti non fit injuria*" is the maxim in such cases in all courts, "and the same rule obtains when the complaining party does not rely upon the misrepresentations, but seeks from other quarters means of verification of the statements made, and acts upon the information thus obtained."

This doctrine, defendant contends, was approved by this court in *McGibbons v. Wilder,* 78 Iowa, 531, 535. But in that case it was further said: "On the other hand, it is said that 'a man to whom a particular and distinct representation has been made is entitled to rely on the representation and need not make any further inquiry, although there are circumstances in the case from which an inference inconsistent with the representation might be drawn.' Kerr, Fraud & Mis-

take, 80. This court has repeatedly held, in effect, that a party may rely upon representations as to the ownership of property, its location, and the like; and that, to entitle him to recover for fraudulent representations, he is not bound to show that he instituted inquiry by consulting records or plats, or employing a surveyor, or the like. *Hale v. Philbrick,* 42 Iowa, 81; *Carmichael v. Vandebur,* 50 Iowa, 651; *State v. McConkey,* 49 Iowa, 499. In the last named case the defendant was imprisoned in the penitentiary for nine months for taking one Hunt to a locality in the city of Des Moines where he stepped and marked off, by stakes at the corners, a lot, and represented that he owned it; that it was block 2 in an addition to the city. Hunt relied upon the representation, and took a conveyance of the lot, and afterwards ascertained that lot 2 in said addition was in the middle of Coon river, and worthless. This court held that the district court did not err in that case by refusing to instruct the jury that they must find that Hunt exercised ordinary prudence and diligence to inform himself of the truth or falsity of the representations; and the holding is that Hunt was not bound to consult maps or plats, or use the knowledge and skill necessary to correctly locate the lot.'' In the same case it was said: ''It is very plain that nothing less than the employment of a competent surveyor to go upon the ground, and possibly the adjacent ground, with his instruments, would have enabled the plaintiff to ascertain the true corners of the land. Is there any legal requirement that a purchaser of real estate shall do this, to the end that he may protect himself against fraudulent representations as to the location of the land? We think not.''

Appellant also cites, as sustaining the doctrine of the *Slaughter* case, *Moore v. Howe,* 115 Iowa, 62, 64; *Dorr v. Cory,* 108 Iowa, 725, 731; *Bell v. Byerson,* 11 Iowa, 233, 237; *Farrar v. Churchill,* 135 U. S. 609 (10 Sup. Ct. 771, 34 L. Ed. 246, 250); *Southern Development Co. of Nevada v. Silva,* 125 U. S. 247 (8 Sup. Ct. 881, 31 L. Ed. 678, 680, 681, 683);

*Farnsworth v. Duffner,* 142 U. S. 43 (12 Sup. Ct. 164, 35 L. Ed. 931, 933, 935); *Shappirio v. Goldberg,* 192 U. S. 232, 239, 241 (24 Sup. Ct. 259, 48 L. Ed. 419, 424); *Brown v. Smith* (C. C.) 109 Fed. 26, 29 to 31. *Henderson v. Henshall,* 54 Fed. 320 (4 C. C. A. 357, 361); *Dambmann v. Schutling,* 75 N. Y. 55, 61, 65; *Chrysler v. Canady,* 90 N. Y. 272, 278, 279 (43 Am. Rep. 166); *Roper v. Trustees of Lodge,* 91 Ill. 518, 520 (33 Am. Rep. 60); *Ladd v. Pigott,* 114 Ill. 647, 652 (2 N. E. 503); *Ripy v. Cronan,* 131 Ky. 631 (115 S. W. 791, 793, 21 L. R. A. (N. S.) 305); *Cole v. Smith,* 26 Colo. 506 (58 Pac. 1086, 1088); *Jones v. Stewart,* 62 Neb. 207 (87 N. W. 12, 13); *Anderson v. McPike,* 86 Mo. 293, 300; *Mahaffey v. Ferguson,* 156 Pa. 156 (27 Atl. 21, 22, 23); *Garrison v. Technic Electrical Works,* 59 N. J. Eq. 440 (45 Atl. 612, 614); *Poland v. Brownell,* 131 Mass. 138, 142 (41 Am. Rep. 215); *Veasey v. Doton,* 3 Allen (Mass.) 380; *Teachout v. Van Hoesen,* 76 Iowa, 113, 118, 119; *Medbury v. Watson,* 6 Metc. (Mass.) 250, 259, 260 (39 Am. Dec. 726). We shall not take the space to review these cases, except to notice one or two of the Iowa cases.

In the *Moore* case, *supra,* the purchaser saw defects in cloaks he was buying, and continued to sell goods after such discovery, and treated the stock as his own for several months, and it was held that under such circumstances he was not entitled to rescind. In the *Dorr* case, 108 Iowa, 725, the representations were as to value. Defendant also cites *Scott v. Burnight,* 131 Iowa, 507; *Hanson v. Kline,* 136 Iowa, 101; *Haack v. Scott* (Iowa) 124 N. W. Rep. 1068; *Moberly v. Alexander,* 19 Iowa, 162; *Ladd v. Pigott,* 114 Ill. 647, 651 (2 N. E. 503); 20 Cyc. 58—on the proposition that where a party is induced not to visit a tract of land which he is buying or trading for, located at a distance, and does not visit it, he may then rely upon the representations made by the seller and is not guilty of neglect to exercise proper precautions. He also cites *Knapp v. Schemmel* (Iowa), 124 N. W. Rep. 309; *Brett v. Van Auken,* 99 Iowa, 553, 554—

on the proposition that relief may be granted where the party has been on the land, but owing to climatic conditions, such as the land being covered with snow, and the like, the party is compelled to rely upon representations as to the character and quality of the soil.

One of the elements of the fraud charged is that plaintiff believed the representations, relied thereon, and was induced thereby to take the Kansas land. As an extreme illustration, if the seller of a horse falsely and fraudulently represents it to be sound when, in fact, it had all four legs cut off, the buyer, upon seeing such a condition, ought not to be allowed to say he relied on the representation. Or if land is represented as level valley land, when, in fact, it consists of high, steep hills and deep ravines, which are obvious, a purchaser examining such land could not say he relied upon the representation, and a jury would not be justified in so finding. As said in the *McGibbons* case: "It has been held that where the seller of a horse falsely and fraudulently represents the animal to be perfect and sound, when in fact he has no tail or has lost an ear, there can be no recovery for such representation, because the defect is as open and obvious to the buyer as it was to the seller."

III.  If it was not obvious to plaintiff when he examined the land shown him by Williamson that it was not the land described and as represented by defendant, then plaintiff contends that he had the right to rely on the representation of defendant that his Kansas land consisted of two hundred acres of valley, or bottom, land, and forty acres of hill land, and upon the statement of defendant's agent, Williamson, that the land shown was the land described and owned by defendant; that such representations were positive statements of fact as of their own knowledge. He relies on *McGibbons v. Wilder, supra; Riley v. Bell,* 120 Iowa, 618; *Boddy v. Henry,* 113 Iowa, 462, 465; *Boddy v. Henry,* 126 Iowa, 31; *Selby v. Matson,* 137 Iowa, 97, 102, 14 L. R. A. (N. S.) 1210;

20 Cyc. 62; *Fargo Gas Light Co. v. Fargo Gas Co.*, 4 N. D. 219 (59 N. W. 1066, 37 L. R. A. 593), note, and like cases.

This court has not followed the rule of the Massachusetts court and some others.

The case of *Parker v. Moulton*, 114 Mass. 99 (19 Am. Rep. 315), cited by appellant, is but following the rule of *Gordon v. Parmelee*, 2 Allen (Mass.) 212, and of *Mooney v. Miller*, 102 Mass. 217, which the Supreme Court of Massachusetts refused to extend, in *Mabardy v. McHugh*, 202 Mass. 148, 149 (88 N. E. 894, 895, 23 L. R. A. (N. S.) 487, 491, 132 Am. St. Rep. 484, 486, 16 Ann. Cas. 500, 501), from which we cite, page 491, where it is said: ''This court, in recent years, by pointed language and by conclusions reached, has indicated a plain disposition not to extend legal immunity for the falsehood of vendors in the course of negotiations for sales beyond the bounds already established. *Dawe v. Morris*, 149 Mass. 188-192 (21 N. E. 313, 4 L. R. A. 158, 14 Am. St. Rep. 404).'' And, same page, saying further: ''In many other jurisdictions the rule of *Gordon v. Parmelee*, and *Mooney v. Miller* has not been followed, and false representations as to area of land, even though true boundaries were pointed out, have been held actionable. *McGhee v. Bell*, 170 Mo. 121, 135, 150 (70 S. W. 493, 59 L. R. A. 761) ; *May v. Loomis*, 140 N. C. 350 (52 S. E. 728) ; *Boddy v. Henry*, 113 Iowa, 462-465 (85 N. W. 771, 53 L. R. A. 769) ; *Boddy v. Henry*, 126 Iowa, 31; *Antle v. Sexton*, 137 Ill. 410 (27 N. E. 691) ; *Estes v. Odom*, 91 Ga. 600-609 (18 S. E. 355) ; *Lovejoy v. Isbell*, 73 Conn. 368-375 (47 Atl. 682) ; *Cawston v. Sturgis*, 29 Or. 331 (43 Pac. 656) ; *Starkweather v. Benjamin*, 32 Mich. 305; *Paine v. Upton*, 87 N. Y. 327 (41 Am. Rep. 371) ; *Mitchell v. Zimmerman*, 4 Tex. 75 (51 Am. Dec. 717) ; *Walling v. Kinnard*, 10 Tex. 508 (60 Am. Dec. 216) ; *Speed v. Hollingsworth*, 54 Kan. 436 (38 Pac. 496). See, also, *Fairchild v. McMahon*, 139 N. Y. 290 (34 N. E. 779, 36 Am. St. Rep. 701) ; *Schumaker v. Mather*, 133 N. Y. 590 (30 N. E. 755).''

The Massachusetts court, in the *Mabardy* case, 202 Mass.

on page 151 (88 N. E. on page 895, 23 L. R. A. (N. S.) on page 491, 132 Am. St. Rep. on page 488, 16 Ann. Cas. on page 502), further express a doubt whether, considering ''the great weight of persuasive authority in its support, especially in view of *Lewis v. Jewell*,'' 151 Mass. 345 (24 N. E. 52, 21 Am. St. Rep. 454), it might not hold that false representations as to the area of land, even though the true boundaries were pointed out, are actionable.

In *Starkweather v. Benjamin*, 32 Mich. 305, among other things, it is said: ''Wherein a defense to an action for deceit in misrepresenting the quantity of land conveyed rested mainly on the ground that the purchaser saw the land, and was as able to judge of its size as the vendor.''

In denying this contention, the court, speaking through Campbell, J., said: ''We do not think the doctrine that where both parties have equal means of judging there is no fraud applies to such a case. The maximum is equally valid that one who dissuades another from inquiry and deceives him to his prejudice is responsible. It cannot be generally true that persons can judge of the contents of a parcel of land by the eye.'' *Cawston v. Sturgis*, 29 Or. 331 ,(43 Pac. 656).

In *Pringle v. Samuel*, 1 Litt. (Ky.) 43 (13 Am. Dec. 214), it is said: ''But to ascertain its quantity, requires a greater skill and larger proportion of science than, even in this age, is acquired by a majority of men. Almost every rational man may be capable of deciding on the quality of land, while but few can ascertain its quantity with accuracy.''

In *Antle v. Sexton*, 137 Ill. 410 (27 N. E. 691), where the false representations consisted of a false statement of the acreage, and the land was pointed out to the vendee, this rule was announced and applied: ''Where a misrepresentation is made as to a material fact, and such misrepresentation is made knowingly and for the express purpose of deceiving and defrauding, and the party injured relies upon the statement made, and under circumstances which should induce a reasonably prudent man to so rely, there must be a right of action

at law for fraud and deceit.  To throw a purchaser out of court in such case, upon the plea he did not avail himself of the means of knowledge open to him, would be offering a premium on fraud, and would be destructive of confidence in business transactions.''  *Estes v. Odom,* 91 Ga. 600 (18 S. E. 355); *Stearns v. Kennedy,* 94 Minn. 439 (103 N. W. 212). *Eichelberger v. Mills Land & Water Co.,* 9 Cal. App. 628 (100 Pac. 117), applied to a small lot 1,400 feet by 170 feet, represented to be 1,400 feet by 270 feet.  *Boggs v. Bush,* 137 Ky. 95 (122 S. W. 220).  *Judd v. Walker,* 215 Mo. 312 (114 S. W. 979), repudiates the doctrine of *Gordon v. Parmelee, supra,* and *Mooney v. Miller.*  The quotations above are from note to *Mabardy v. McHugh,* 23 L. R. A. (N. S.) 487-490.

When the party charging false and fraudulent representations has shown that the representations were made and that they were false and known to be false by the party making them, the intent to deceive is implied or presumed.  *Boddy v. Henry,* 126 Iowa, 31, 37, on page 41, in which case it is further said:

It is well settled that the buyer who examines land before purchasing may nevertheless rely upon the representations of the seller as to measurements.  *Pringle v. Samuel,* 11 Ky. ( 1 Litt.) 43 (13 Am. Dec. 214), is an instructive case upon this point.  The owner of a small farm contracted to convey it for the gross sum of $1,000.  In a subsequent litigation between the parties, the purchaser set up a claim that the seller had falsely represented the farm to contain fifty acres, when, in fact, it proved to contain a materially smaller quantity.  It was shown that the purchaser saw the land before buying, and expressed a doubt as to the number of acres, but accepted the seller's word, and made the purchase.  The seller contended, as is done here, that the purchaser, having looked at the land, was bound to protect himself, and could not be heard to say that he relied upon the representations made to him.  The opinion proceeds:  'It is also contended that the maxim *caveat emptor* applies and bars relief, and that the plaintiff was as much bound to ascertain the true quantity as the defendant, and that by admeasurement he could have

discovered the truth of the fact, and for that reason he is not entitled to sustain his bill. We do not remember any case in which the maxim quoted has been used by the chancellor in such manner as to compel him to shut his ears against false representations, or to give latitude to the vendor of real estate to state facts untruly without any responsibility.'

Again, in *Boddy v. Henry, supra,* on pages 42-43, quoting from *Starkweather v. Benjamin,* 32 Mich. 305, it is said:

When a positive assurance of the area of a parcel of land is made by the vendor to the vendee, with the design of making the vendee believe it, that assurance is very material, and equivalent to an assurance of measurement. The rule of the case here cited is especially applicable to facts like those at bar, where the buyer is referred for information to the seller's own agent, who answers the inquiry in a manner to confirm and strengthen the buyer's confidence in the truth of the representations made by the principal. Plaintiff could not have measured and ascertained the quantity of these lands with any degree of certainty without much time and expense, and we think there is no principle of law or equity which required him to rely upon the defendants' representations at his peril.

"Whether they were false and fraudulently made, and whether plaintiff believed and relied upon said representations were questions for the jury." *Boddy v. Henry,* 126 Iowa, 31, 43.

As stated, appellant makes no complaint of the instructions in this respect, and, this being so, they should be considered as the law of the case. It is not, perhaps, so much a question of negligence on the part of the purchaser, but, rather, whether, seeing the conditions, he may rely on representations which are obviously not true.

2. INSTRUCTIONS: when the law of the case.

Whether the representations were falsely and fraudulently made, whether plaintiff believed and relied upon them, and whether, under the evidence and the instructions given,

he, as a prudent man, should have done so were questions for the jury.

It would not be practical to give even the substance of the four hundred pages of evidence contained in the abstract, nor do we think it necessary to do so because there is a conflict. Some of the more important points will be mentioned. Though there was a conflict, plaintiff's evidence tended to show, and the jury could have so found, that the representations were made by defendant as alleged; that defendant stated he knew the land, and every foot of that county, because he had sold land there for the railway for many years. It will be noticed that the contracts do not give a technical description of the land. Plaintiff testifies that he asked defendant if he would go to Kansas and show the land, and defendant said he could not; that plaintiff then asked defendant to give him the numbers of the land so he could go out and get some one to look it up for him; that defendant said he could not do that; that he could not go by anything on the map, and the defendant said that whenever he sold or traded anything he always showed it; that defendant said he would send Williamson out to show plaintiff the land, and that Williamson knew where it was.

3. FRAUD IN THE SALE OF LAND: representations as to character and location: reliance thereon: evidence.

It appears that defendant obtained this land in a trade a year or such a matter before through Williamson, or that Williamson, was in some way interested in the trade. Williamson told plaintiff he had seen the land before. Plaintiff and Williamson did go together. Defendant gave Williamson an abstract of title, but this was not shown to plaintiff until they were on the Kansas land. Plaintiff is illiterate. Defendant's land was in section 19. According to plaintiff's witnesses, it consisted of sand hills and was worth about $2.50 per acre. Defendant's witnesses put the value at about $5 an acre, some of them perhaps more. The taxes on the entire tract of two hundred and forty acres were $3. This is the land which was deeded to plaintiff under the contract. The

undisputed evidence is that the land actually shown plaintiff
was in section 11. Plaintiff's witnesses say that there was a
tract of two hundred acres, or about that, in the land shown
plaintiff in section 11, which corresponded with the descrip-
tion of the defendant's land as represented, though defend-
ant's witnesses describe it as similar to defendant's land in
section 19. When plaintiff and Williamson were on the land
in section 11, Williamson told plaintiff that this was the land
owned by defendant and for which plaintiff was trading.
This is testified to by plaintiff and Bellamy, and is not denied
by Williamson. Though subpœnaed by defendant, William-
son did not testify for either party. ·

The evidence is undisputed that before plaintiff went to
Kansas to inspect the land he understood defendant's property
in section 19 was raw, unimproved land. He says that dur-
ing the negotiations defendant told him that it was wild land,
but that the cattlemen had fenced it. It is also undisputed
that on section 11, a part of which was shown to plaintiff as
defendant's land, were houses and outbuildings. One house
is situated in the northwest corner of the northwest quarter,
another near the northwest corner of the northeast quarter,
another near the northeast corner of this quarter, and a small,
one-story pumping house, 14x16 feet, near the southwest
corner of this quarter. There is another small pumphouse and
a dwelling on the west side of the southwest quarter. There
is also a dwelling house on the section east of 11, about east
of the southeast corner of the northeast quarter of 11. There
is an east and west fence through the center of section 11, and
one on the west side of the southeast quarter. The pumping
plant was run by electricity. There is a row of electric poles
from the west pumping house running northeast to the pump-
ing house in the northeast quarter, and thence northeast to a
point about forty rods south of the northeast corner of the
northeast quarter. At the time in question there was some
alfalfa growing on section 11, a few acres in the southeast
corner of the northwest quarter and the northeast corner of

the southwest quarter. There are no improvements on the southeast quarter except the fences on the west and north sides of it. Plaintiff and Williamson were on this one hundred and sixty acres, that is, the southeast of 11, when Williamson told plaintiff that the two hundred acres about them was the two hundred acres of valley land belonging to defendant.

From the circumstances just mentioned, it is argued by appellant that it must have been obvious to plaintiff that the land shown him by Williamson was not the raw land which had been described by the defendant, and that he had no right to rely on the statement of Williamson that this was the land. It will be seen that the southeast quarter of 11, containing one hundred and sixty acres, which, as stated, answered the description as to the character of defendant's valley land as represented, according to plaintiff's witnesses, was nearly the amount stated, to wit, two hundred acres, and that, by taking a part of some or all of the other three quarters into consideration, there could be two hundred acres of such land, measured as well as a man could by the eye. The buildings described were on six hundred and forty acres. There was hill land to the south of and adjoining section 11.

We shall now refer to some of the circumstances shown in the evidence from which the jury may have found, and which in our opinion authorized the jury in finding, that plaintiff was justified in relying on Williamson's assertion that the land shown was the land belonging to the defendant. Some of these tend to show that Williamson was intentionally trying to deceive plaintiff. Defendant and Williamson had said they were acquainted with the land, and defendant had told plaintiff that Williamson knew the land, and for that reason defendant sent Williamson to show it. The defendant is presumed to know the location of his own land. *Selby v. Matson,* 137 Iowa, 97, 102.

Plaintiff was an entire stranger in that country. It was a cold, foggy, rainy day. The nearest dwelling house on sec-

tion 11 was about half a mile from the parties as they stood on the southeast quarter. As they left the town of Lakin, in a two-seated carriage, to go to the land, plaintiff was in the back seat; a part, at least, of the carriage curtains were down; Williamson directed the driver where to go. They approached section 11 from the north, passing the house in the northwest corner of the section thence south along the road on the west side of the section, passing the dwelling and pumping house on the west side of the southwest quarter; thence east along the south side of the section to the southeast corner; thence north one-half mile to the northeast corner of the southeast quarter; then drove on the southeast quarter. Plaintiff was for the first time told that this was the land when they came on the southeast quarter, or as they were driving along the side of it. Plaintiff might have noticed that these two dwellings they had passed were on this section, but he was not told that the land they were to look at was in this section until they had passed the houses. After or while looking over the southeast quarter, they drove to the center of the section, and, after the examination was concluded, they drove north over a private way to the public road on the north side of the section. They could have reached the center of the section, which would have brought them to the northwest corner of the southeast quarter, by driving one-half mile east from the northwest corner of the section, and then south one-half mile, but, instead, they drove three miles to reach the same point, and in doing so went along three sides of the southeast quarter. It is the claim of plaintiff that Williamson was acquainted with the country, and that this roundabout drive was for the purpose of exhibiting the southeast quarter. As stated, the land of defendant was not described in the contracts. Plaintiff says he did not know the description of it and did not know the section or quarter they were on. While they were on the southeast quarter Williamson took from his pocket the abstract that had been given him by defendant and said this was the land.

Plaintiff says he did not examine the abstract or ask to do so. It would have been difficult, if not impossible, for him to have located the land from the abstract alone. While on the southeast quarter, plaintiff remarked to Williamson that this looked like the land described by defendant. He also expressed some doubt as to whether there was as much as 200 acres of the valley land there, and suggested that they get a surveyor, but he says Williamson told him there was "more of that level land than you think; that it is further across there than you think," and that to get a surveyor would take time. He assured plaintiff it was all there. Plaintiff claims this was done for the purpose of preventing an investigation.

As a witness, plaintiff testified he thought there were about two hundred acres of the valley land. Plaintiff also says that Williamson told him that the fences had been put there by the cattlemen since he saw it, and that he thought the fence on the north side of the southeast quarter was not on the line; that the line was further north than the fence.

Witness Gibson, who built the fences, testified that some of them had, in fact, been moved. It is not quite clear from his evidence whether or not they were first put on the line and afterwards moved. His evidence is: "The fences were put on the line where they surveyed; they were straight; I built the fence around the section myself and put in some of the cross fence, but they have all been moved; I never put in any fence along any survey in the inside of the section, but this fence that runs east and west from Long's that was surveyed right there, and stakes in and posts put right along there, and this fence that runs from the pumphouse down to the line—they were all surveyed; the company put in the fences; I seen the stakes; that fence comes right along there where it was surveyed; it was surveyed down by our place and they were going to divide it into four quarters."

It is true that plaintiff saw the poles, the pumping house near the center of the section, and the growing alfalfa west of the fence on the west side of the southeast quarter, on land,

which it would be necessary to take in in order to, in fact, make 200 acres of level land, but the question is: How did it appear to plaintiff at that time and under the circumstances shown? Plaintiff had never seen this land before; he had never seen the land in section 19. Defendant had sent his agent, Williamson, with plaintiff for the very purpose of showing the land. We think, under all the circumstances, plaintiff had the right to rely on Williamson's representations that this was the land, without further investigation or inquiry, even though there were "circumstances in the case from which an inference inconsistent with the representation might be drawn." *McGibbons v. Wilder, supra,* 78 Iowa, at page 535. Plaintiff was not required to employ a surveyor to determine the location of the land or that there were two hundred acres of valley land there. *McGibbons v. Wilder,* 78 Iowa, at page 534. It should be said in regard to the matters last referred to that plaintiff testifies that Williamson said the poles ran east and west. The center pumping house stood about one hundred yards north of the east and west fence. No explanation of why it was there was asked or given. Plaintiff had been told by defendant, so he says, that there was land in cultivation over the fence, and there was alfalfa growing west of the fence. It was for the jury to say, under the instructions given, whether there was anything in these last-named circumstances, or under all the facts, to advise plaintiff that the land was not the land of defendant.

IV. Complaint is made of these words in instruction 14, "what, if any, inquiries he made from others living near the land." It is said there was no evidence that he made any such inquiries, and this appears to be the fact, but appellant has not given it all. The entire clause is, "what, if any, inquiries he made from others living near the land, and, if he made no such inquiries, the reason therefor." This means no more than saying that the jury should consider whether or not he made inquiries, and, if he did not, the reason for not doing so. Plaintiff did explain why he did not make inquiries.

Furthermore, substantially the same idea appears in defendant's requested instruction No. 8, and for this reason he has no just cause for complaint.

V. It is said the court erred in giving instruction 17. It reads: "If you find for plaintiff, you will allow him as damages the difference in the fair market value of Neil's land in section 19 and the actual market value of the land shown to plaintiff by Williamson, or what it would be worth if it had been as represented by defendant, if he made any representation as to the land, not exceeding the amount claimed in petition." The criticism of this instruction is, as appellant states it, that as plaintiff predicates his case upon the land which he saw, or claims was pointed out to him in section 11, the instruction should have been limited to the land which he says he saw, and which was pointed out to him as the Neil land. That, having seen for himself the land which he claims he supposed he was getting, his eyes were his market, and the representations which he claims had been made became immaterial; that the case would be different if he had not gone out to see the land and relied wholly upon what he claims were Neil's representations of it. The comparison in that case would have been between the land in section 19, as it was, and as it was represented to be.

4. SAME: measure of damages: instruction.

Counsel appear to have overlooked the pleadings. It is alleged in the petition:

Plaintiff avers the fact to be that the defendant, Neil, well knew, and his agent knew, that the land so shown to plaintiff was not the land owned by W. J. Neil nor the land that he expected to deed to plaintiff in exchange for plaintiff's farm; that defendant knew that the representations that he made, that two hundred acres of the land that he claimed to own in Kansas and intended to deed to plaintiff was bottom or valley land and forty acres only hill land, was false and untrue, and said representations were made by the defendant and his agent for the purpose of cheating and defrauding this plaintiff and that they were relied upon by this plaint-

iff and were the means of defrauding plaintiff to his damage as hereinafter more fully set out. That, had the land that plaintiff received in exchange for his farm been of the character and had been in fact the land that was shown to him by defendant's said agent, and had it been of the character and quality and laid as represented by defendant as laying, it would have been worth, etc. (Again:) Plaintiff charges that the defendant, W. J. Neil and his agent conspired together to cheat and defraud the plaintiff out of his farm by means of showing to him in Kansas other and different land from that which defendant owned and intended to convey to plaintiff and the other false and fraudulent representations herein set out. That plaintiff has been and is damaged, by reason of the fraud so practiced upon him by the defendant from his own representations and that were made by his agent, in that that is the difference between the value of the land as represented to him to be and the land he was to receive in exchange and the value of the land that he did receive in exchange for his said farm.

We think plaintiff had a right to rely upon the statement of defendant's agent, purporting to be made from the agent's personal knowledge that there were two hundred acres in the valley land shown him by the defendant's agent; that the fences were not on the line; and that it had been fenced since Williamson claimed to have last before seen it. Plaintiff had a right to rely upon the agent's statement, notwithstanding the cross fences and the poles and pumping shack he found upon the land.

Again, the jury could have found from the evidence that the land shown by Williamson tallied with that described by the defendant. Under the pleadings and the evidence, we think the instruction is correct.

VI. There was no error in refusing to give defendant's requested instruction No. 6. The thought of it is that from what plaintiff saw he had no right to rely on Williamson's statement that the land being shown was defendant's land. This matter has been disposed of by what we have already said.

Offered instruction 8 enumerated some other circumstances than those mentioned in No. 14 given by the court which the jury might consider in determining whether plaintiff, as a prudent man, relied on Williamson's statement that the land in section 11 was the land of defendant. But the circumstances were quite fully stated in 14, and the court told the jury to consider all the facts and circumstances in evidence on this question. It was all that was required. It was, to some extent, a matter of argument, and doubtless all the facts were argued to the jury.

VII. Defendant's offered instruction No. 9 reads: "(9) If you find from the evidence in this case that the plaintiff was honestly mistaken in supposing that two hundred and forty acres in said section 11 in Kearney county was, in fact, the land which was owned by the defendant, Neil, and that the defendant, Neil, was also honestly mistaken in assuming that the plaintiff had seen the right land after he returned from Kansas and at the time the transaction was closed and the deeds passed and delivered, then the plaintiff cannot recover damages in this case, his remedy under such circumstances would be rescission, and by rescission is meant putting each party back in the position he was before the contract was made, or the sale or exchange perfected, that is, restoring to each party that which he had parted with under the contract or sale or exchange." This ignores entirely the acts of Williamson. If Williamson acted fraudulently, as claimed, and was the agent of defendant in showing the wrong land, defendant would be responsible, for Williamson was acting within the scope of the agency.

5. SAME: fraud of agent: liability of principal.

Defendant contends for the offered instruction that, in case of mistake, plaintiff's only remedy is rescission. We have no question of warranty. In case of mistake, plaintiff could rescind in equity, but he has not asked that. For the fraud, he could rescind or abide by the trade and sue for damages. Defendant cites, as sustaining his position *Clapp v. Greenlee,*

6. SAME: fraud: rights of purchaser.

100 Iowa, 586, 593; *Holmes v. Clark*, 10 Iowa, 423; *Boddy v. Henry*, 126 Iowa, 31, 45; *Smith v. Bricker*, 86 Iowa, 285, 288.

The *Clapp* case was an action in equity to rescind. The evidence in that case tended to show that the land conveyed was as valuable as the land contracted for, and it was urged that if this was true there could be no rescission. The court held otherwise, and in the discussion said: "It is likely true that proof of such facts would be a complete defense in an action at law for fraud." It would be a defense in the sense that there would be no damage. If there was no damage, the verdict would be for defendant. No more than this was meant by the language of the opinion, as appears by what follows the part quoted.

In the case at bar defendant attempted to prove that the land in section 19 was worth as much as that in section 11. Had he satisfied the jury of that fact, he should have had the verdict.

The *Holmes* case was reversed because an instruction given did not include the idea of *scienter*, and offered instructions 2 and 4, which were refused, did cover that point. Because the evidence tended so strongly to show that defendant was himself mistaken as to the location and quality of the land, the court said the third instruction should have been given. The substance of the third instruction was that, if defendant was mistaken and made the representations in good faith, plaintiff could not recover. That case is not like the one at bar in its facts because of the acts of Williamson. Aside from this, we think the doctrine of the third instruction in the *Holmes* case was covered by the instructions in the case at bar, for that the court instructed that plaintiff was suing for fraud, and that before he could recover he must establish all the elements, which were stated.

The *Boddy* case holds: "The introduction of the words 'more or less' or 'about' or 'estimated' in a conveyance or contract for conveyance does not afford a shield against liability

for false representations, and the mere fact that a deficiency is very large in proportion to the supposed quantity is often treated as in itself evidence of fraud or of mutual mistake. In such case the purchaser may obtain relief in equity by rescission, or by abatement from the purchase price, or, if the purchase price has been paid, and especially if, by reason of any act on the part of the grantor, rescission has been made impracticable, he may have his action at law for damages." This does not sustain appellant's contention.

The *Smith* case was an action in equity to rescind, and holds that there may be a rescission in equity for fraud without proof of *scienter*, or for mutual mistake, without fraud.

Plaintiff had the right to elect whether he would keep the land and sue for damages for false and fraudulent representations, or bring an action in equity to rescind, and a party who is guilty of fraud and deceit is in no position to complain because only damages are asked on account thereof. *Wicks v. Investment Co.*, 150 Iowa, 112, 115; *Salm, Adm'r, v. Israel Bros.*, 74 Iowa, 314; *Stoke v. Converse*, 153 Iowa, 274, (38 L. R. A. (U. S.) 465). Defendant offered to trade back, but declined to place plaintiff in the situation he was in before the trade. He demanded of plaintiff the money for incumbrances paid off in the sum of about $5,000.

7. SAME: election of remedies: who may object.

VIII. The court did not specifically charge that the burden was on plaintiff to show that Williamson was the agent of defendant. Ordinarily, this would be a collateral issue, not requiring a specific instruction as to the burden of proof. Under the issues in this case as tendered by the pleadings, it would have been well enough to have given such an instruction. We should not reverse for this because we think the point was sufficiently covered. In instruction 4 the court said: "The basis of this action is fraud and deceit. . . . The burden of proof is on plaintiff in this case, and in order to recover he must show by the greater weight or preponderance of the

8. SAME: instructions: burden of proof.

evidence that he had been defrauded by defendant as alleged in his petition.''

In the fifth instruction before quoted, the jury was told that plaintiff must show by a preponderance of the evidence that the representations were made as alleged and that plaintiff relied upon them, and that in so doing he exercised ordinary care and prudence. Having thus fully instructed upon the burden of proof it was not necessary to repeat that the burden of proof was upon plaintiff to show the falsity of these representations claimed to have been made, in part by the defendant, and in part by Williamson, whom he claimed was defendant's agent. It is said by the court that the burden of proof is on the plaintiff to show by the greater weight or preponderance of the evidence that he has been defrauded by defendant as alleged. And one of the principal charges is that one of the means used by defendant was Williamson, who was his agent. The burden of proof then was upon plaintiff to show not only that he was so defrauded, but that the instrument used was defendant's agent; for it is alleged such was the scheme by which defendant circumvented plaintiff to his damage.

No. 12 of defendant's requested instructions was covered by those given by the court.

Requests 14, 15, and 16 were to the effect that plaintiff had no right to believe that any part of the southwest, or northeast or northwest quarters of section 11 was a part of the land owned by defendant and are disposed of by what we have already said.

From the evidence, the jury may well have found that the land as represented, or shown, would have been worth as much as $20 an acre, and that the land in section 19, actually conveyed was not worth more than $2.50 per acre. The amount allowed was $3,500, or $17.50 per acre, for two hundred acres. In our opinion, it is not excessive.

IX. Complaint is made of rulings of the court on objections to evidence. These relate for the most part to allow-

ing witnesses to give their opinion as to the value of two
hundred acres of level or valley land lying
near the pumping station in section 11, and
in allowing them to consider any part of said section other
than the southeast quarter in making up the two hundred
acres of valley land.

9. SAME: evidence of value.

As before stated, plaintiff and Williamson were on the
southeast quarter and near this pumping station, when Wil-
liamson made the statement that they were on the land of
defendant.

For the reasons heretofore given, we think the evidence
was competent. The case has been carefully and well pre-
sented. We have examined the large record with care, and
conclude that there was no prejudicial error. The judgment
is therefore *Affirmed*.

All the justices concur.